We're ready to call the case, In Re Processed Egg Products Antitrust Litigation, and Ms. Sullivan, if you would please introduce yourself and proceed. Good morning, Your Honors, and may it please the Court, Kathleen Sullivan for the Plaintiff's Appellant, and I would like to request three minutes for rebuttal. That's done. Thank you, Your Honor. Our antitrust laws treat horizontal agreements to reduce supply as per se anti-competitive and have done so for almost a century, and it's easy to see why. A horizontal supply reduction agreement is really the functional equivalent of a price fixing agreement because its natural effect is to raise prices in a market that, like the market here, responds to ordinary competitive forces. Can I interrupt you right there, Ms. Sullivan, and ask you, that's a pretty easy out is to say, hey, it's horizontal, therefore we're done. Isn't there a lot of case law, lots of case law that says if there are pro-competitive aspects to an arrangement that you're complaining of, it's not purely a matter of supply suppression and price increasing, then that's the realm for the rule of reason. Yes, Your Honor, but that's not this case because in this case, we have a jury finding in the jury verdict form at Joint Appendix, page 760, that there was an overarching conspiracy to reduce the supply of eggs carried out through the three interlocking mechanisms of short-term supply restrictions, the UEP certification program, and exports of eggs at a loss. What else did the jury find? Well, the jury also found, Your Honor, that Rose Aker participated in the conspiracy and that it was a reasonable restraint of trade, and that's where we think the legal error is, Your Honor. The jury verdict form here at Joint Appendix, page 760, embodies a legal error. Even if, Your Honor, we're correct that there is some latitude for disputes of fact in a so-called mixed motive case, that is not this case because here the jury found, and we have no quarrel with the instruction that told them that there has to be an intent and effect to reduce supply to find a conspiracy, here the jury found under that instruction that here Rose Aker participated in a conspiracy to reduce supply. So any issue there would go away. We'd also suggest, Your Honor, that the mechanism for how supply is reduced doesn't matter. We cite cases from the United States against the Coney vacuum to the present showing that a mechanism need not be an express supply reduction in order to trigger the per se rule. May I ask a question? What do we do with the jury's finding that the restraint of trade was, in fact, reasonable? We find that it was legal error to allow that finding once the jury had found a conspiracy to reduce supply. Your Honor, we think this should not be the first case in the history of the antitrust laws to deem a horizontal supply reduction conspiracy reasonable, and we think the only issue really for the court... Isn't it possible, Ms. Sullivan, that the jury could say, yes, one of their intents was to reduce supply, and at the same time say it was okay for them to be thinking about reduced supply because of these other things that were in the... It was, you know, you were going to actually get better, healthier birds. That was an appropriate thing for the farmers to be thinking about. You were going to get not just more humane conditions, but you might actually get in... You know, that these other things could be in the mix, and the jury also say, well, yeah, they were thinking about reducing supply, but they also had good things in mind, and therefore we think it wasn't an unreasonable restraint of trade. Why is the finding that there was... That one issue or motive might have been reduction in supply, by that fact alone, the driver of everything else? Because, Your Honor, the nature of the per se rule is a conclusive presumption that no matter what the set of motives at stake, if the intent and effect of the program was to reduce supply, that's the end of the matter. It's anti-competitive per se. Why do we have to follow the per se rule as opposed to the rule of reason? We think, Your Honor, that you're bound by a century of precedent that says supply reduction conspiracies, like the one the jury found here, are per se anti-competitive without regard to balancing any possible reasonableness or pro-competitive aspect. And, Your Honor, let me just point out a couple of other aspects. Wait, you just rushed past the point that we're trying to explore with you, which I want to stay on. In light of what the Supreme Court said not all that long ago in the Ligon case, you know, that's what, 12, 13 years ago, that per se rules are to be adopted only when you can predict with confidence that in all or almost all instances this would have been invalidated under the rule of reason. I think I've got that concept right. If we're looking at this and trying to rationalize what the jury did, why wouldn't we look at that and say, they did say under the rule of reason this would be okay, and therefore the per se, application of a per se rule wouldn't be appropriate, according to the Supreme Court's language in Ligon. So, Your Honor, Ligon actually expressly stated that horizontal supply restrictions remain subject to the per se rule. Ligon did abandon the per se rule of anti-competitiveness for vertical resale price maintenance agreements, but it expressly distinguished a case like ours. The Supreme Court said, oh, those horizontal supply restriction cases, those are still subject to the per se rule. And this is a case where in light of question one of the verdict form, I'm sorry, Your Honor. I'm trying to get, let me quote the language I want you to address specifically. Quote. Per se rule is appropriate only, ellipsis, if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason. That's the language I'm focused on. And now looking at the jury verdict. The jury apparently thought there was some attempt or desire to suppress supply and also thought that this was a reasonable return trade, good things were happening as well. That there were, so if the jury thought that, looking at the Supreme Court's language in Ligon, why wouldn't we say, well, clearly it's not the case that this would be valid in every case where the rule of reason was applied. Because this jury thought if the rule of reason applied, it wasn't unlawful. Why isn't that, based on the Supreme Court's instruction to us, guidance that would say, no, per se doesn't apply? Well, Your Honor, because the jury was erroneously allowed to reach the rule of reason in the first place. The jury should have been never given question three on the verdict form and never instructed to imply the rule of reason because question one. Did you object to that? Was that objected to in front of the trial court? Don't give that verdict sheet to them? Yes, it was, Your Honor, in the following sense. We litigated the per se rule versus the rule of reason in multiple ways over the course of the case and we preserved those prior objections to application of the rule of reason at the charge conference. It was not preserved with that charge sheet, was it? I thought, and maybe I misread this, I thought, in fact, that when it came to the charge conference, indeed, the assertion was, we're prepared to try this under the rule of reason as an overarching conspiracy and that no objection was made to the verdict form. Am I wrong about that? Yes, Your Honor, I'm afraid so. If you look at the joint appendix at 1283 and 84 and also 1286 and 87, you'll see our pretrial statements to the court that we were willing to try the case under the rule of reason under protest while preserving our appeal that the per se rule should have applied. The district court acknowledged that preserved objection in several places, Your Honor. I would cite in particular joint appendix page 177. That's the initial summary judgment ruling in which she said nobody has waived their rule of reason versus per se arguments. That was in the context of your client saying that the other side was found and it waived something, right? Well, no, Your Honor. What the district court went on to do is hold on the merits that the rule of reason applied. We made a motion to confirm application of the per se rule. Our motion is at joint appendix 698 to 710. And this is crucial, Your Honor. In the motion to confirm at 173 to 182 of the joint appendix, the district court reaches the merits and says, no, I'm applying the rule of reason over your objections that the per se rule applied. Now, Your Honor, we think that you needn't – we think we did preserve, but you also have a root under Rule 59E to amend the judgment to conform – to correct a clear error of rule and avoid – a clear error of law and avoid manifest injustice. So we think we did preserve. We think if we didn't preserve that you can rule on plain error. And we also think that the easiest route here, given that we have a jury verdict, is for you to reverse the court's denial of our motion to conform the jury verdict to the correct legal standard under Rule 59E under the well-settled – The court said to your – I keep saying your, Ms. Sullivan. I'm assuming – I don't know whether you were the trial counsel or not, but you know what I'm getting at. Yes. When you were in front of the trial judge and Judge Prater said, hey, if you want me to look beyond the single issue – there were three of them – if you want me to look beyond the UEP certified program and make a judgment about per se or rule of reason, you're going to have to brief that. That briefing never happened, did it? It did, Your Honor. If I could respectfully disagree with you, that briefing did happen, and I'll cite you the exact pages of the joint appendix where it did. In the joint appendix at pages 2787 to 2797, our post-hearing submission regarding per se liability, we made that argument with respect to all three aspects of the program that the per se rule applied. We argued there that there was one overarching conspiracy and per se applied to all three parts of it, and we also made the same argument, Your Honor, at joint appendix 698 to 710, where we made a motion to confirm application of the per se rule, and then the court ruled on it. So there could be no doubt – Hold on a second. I'll have to go and dig back into that, but I'm not talking about a generalized statement that all three are of one piece and this is one overarching conspiracy. I understand that you made that argument repeatedly. I'm talking about Judge Prater's statement that we've looked at the QEP certification program. Now you've got two others. If you want me looking at those two things, please brief that. Brief each of those. Did that happen? Did each of those separate ones get briefed? No, Your Honor. We did not file separate briefing on the supply restrictions and export program because of their position. Is that irrelevant? If the district court says, if you want me looking at these other things, you brief those things. Is it enough for you at that point to say, well, we talked about it all being an overall conspiracy and we said that over and over again, so that's good enough? If the district court says, I want briefing on those things if you want me to decide it and you don't brief those things, is that not a forfeiture? No, Your Honor. With respect, what happened in the course of the charge conference was that the district court came to a set of instructions and a verdict form, which as you can see from the verdict form itself on Joint Appendix page 760, asked the question in question one, do you find by a preponderance of the evidence that there was a single overarching conspiracy to reduce supply comprised of all three of short-term supply recommendations, the United Egg Producers Certified Program, and United States Egg Marketers Exports? And when the judge came to that position, there's no question that the defendants had an opportunity to disagree with that instruction, that the jury should look to one overarching conspiracy involving all three, and they didn't object. So we believe that we preserved, and Your Honor, if I could give you one more site, at Joint Appendix 1019 in the charge conference, you'll see that we, my colleague who was the trial counsel, rose to say, do we need to repeat our earlier objections? And the district court said, no, you don't. All your prior positions are preserved. And she reiterated that in her Rule 59e ruling at Joint Appendix page 187 where she said the plaintiffs repeatedly asked me to apply the per se rule to one overarching conspiracy including all three parts. And I recognize the district court said that they tried to preserve that for appeal, not withstanding that the case was tried under the rule of reason. But Your Honor, we have a verdict now. And I think that these are, to the extent there are detailed factual issues about who the plaintiff is, the purpose, of course, Your Honor, of notice and waiver doctrines is to make sure the district court was fully apprised of our position. And it certainly was. But now, in our view, Your Honor, we think it certainly was. But we now have a jury verdict. And the jury here found one overarching conspiracy that included the supply restrictions and the export program. Good. Yeah, we got it. We understand that. I guess what you're pressing on us, and we understand the point, is that I think there's a legal error because the jury should never have been given that last question. Once the per se, once they found there was a restraint, that's it. Game up. Game over. Automatic. Done. That's the position, right? That's exactly right, Your Honor. Okay. Well, you've got your rebuttal time reserved. Let me ask Judge Restrepo and Judge Fuentes if they have any questions for you here on your opening. Judge Restrepo? I don't, Your Honor. I don't. Judge Fuentes? Well, just briefly, I thought in reviewing that the egg producers had their backs against the wall in the name of animal rights groups. And Walmart threatened to terminate the contracts. Didn't that justify the certified program? And didn't it have obvious pro-competitive benefits? Well, Your Honor, even if animal welfare is responsive to consumer demand, that wouldn't justify a conspiracy among the producers to restrict supply. And, Your Honor, for example, the jury didn't find all three egg producers liable here. It answered no to the question whether Ohio Fresh Eggs and RW Souder participated in the conspiracy. So, Your Honor, it would be fine for a producer unilaterally to respond to the animal rights folks. But what the antitrust laws forbid is getting together to say, hey, let's all restrict supply by reducing the number of hens that are laying and increasing cage requirements because that will reduce the supply of eggs. And, Your Honor, you know, of course, there was ample evidence at the trial to support the view that the effect was to lead to higher prices. You know, the producers congratulated each other on having raised a billion dollars more and so forth. And we have to remember that the other producers did, after all, settle for $130 million here. So I think the jury verdict, my simple answer, Judge Fuentes, would be you don't have to enter a conspiracy in restraint of trade to satisfy animal welfare rights. And Ohio Fresh Eggs and RW Souder were let off the hook by the jury. And there's no reason one rose acre entered a conspiracy why it should be. You focus on restricting supply. Isn't there also evidence in the record that egg supply actually increased during the class period? Well, Your Honor, the evidence in the record was that egg supply was restricted compared with what it would have been but for the conspiracy. So, you know, we're comparing the but for world, no conspiracy, there would have been far greater supply. So you can't just look at the supply increase from the prior period to the class period. You have to look at the class period versus the but for world of no conspiracy. And there was overwhelming evidence that egg supply was decreased compared to where it would have been and that prices went up nearly 20% as a result. Thank you. I realize we're kind of on a time crunch here and I should make counsel aware that we're trying to get arguments today wrapped up in time for the building in Philadelphia to close because of COVID-19 issues that have arisen. And not incidentally, thank you, Ms. Sullivan and Mr. Levine for being present by phone. Recognize this is unusual, but we're all in unusual times. Having said that, with my colleague's indulgence, I do want to ask a question which I think is likely to come up in Mr. Levine's argument, but I'm curious to hear from you in the first instance, Ms. Sullivan. They've made their, they've filed their cross appeal contingent on your getting the winning on the legal position taken. And among other things, they said the class certification here was erroneous that once it came to the fore that Dr. Ouster's overcharge model was using post-2008 transaction data, that undermined the class certification decision. And would you, what's your response? Assuming for the sake argument we thought you were right, then we would have to confront that issue. What's your argument for how you can stand up the class certification if by the court's own decision making, it should have been cut off as of 2008, the date of that? Yes, Your Honor, we would respectfully ask that you reject the cross appeal on class certification. And let's just be clear, there's no challenge here to the initial class certification order. And there's only a challenge to the failure to decertify after the class period was narrowed to 2008. Therefore, on all of the findings that Judge Prater made in her initial order at Joint Class really can't be contested now. As to the rejection of decertification, we think that Judge Prater correctly rejected the argument for decertification. And that is because this case is about class-wide evidence of a conspiracy to restrict the supply of eggs and drive up egg prices. And it can be defended against with class-wide defenses. And everything that the other side, everything the defendants have said about what's wrong with Dr. Rausser's model is really class-wide objection to the evidence. And that's classically for a jury to decide. It goes to the weight and strength of the argument about the class injury. It doesn't go to whether it's class-wide. And remember, Your Honor, we've now had a trial which was tried on injury. The jury didn't reach injury, of course, but it was tried based on class-wide evidence. There was no individualized evidence. And it's easy to see why. We put on evidence that the producers got together, restricted the supply of eggs, drove up the price of eggs nationwide in a nationwide market. And there's really no dispute here that it's nationwide. So, Your Honor, I can give more specific reasons why the post-2008 evidence is still relevant. Maybe I could say it in a nutshell. We've got the brief, but I wanted to tee that up because I want to ask Mr. Levine about it a little bit. And so, I've got your position here in oral argument. Thanks very much. I do have one quick question for Ms. Alden. So, is it your position that a horizontal agreement to reduce supply is the same as a horizontal agreement to fix prices? Or is that a distinction without a difference? It's our position it's exactly the same, Your Honor. And that's because in most markets, a supply restriction drives up prices. And the evidence was overwhelming here that that's how the egg market behaves. People don't buy less eggs if the price goes up. Eggs are subject to an inelastic demand curve. So, this is a case where if you restrict the supply, prices go up. And you can look at the evidence at Joint Appendix 1036, 1076, some of the key admissions by defendants, that their program was working to drive up prices. So, we regard and the Supreme Court regards them as the same thing, Your Honor. And that was reiterated in Ligon. Ligon didn't do anything to get rid of that assumption, which has been built into our laws for a century. Okay. Thank you, Ms. Alden. Mr. Levine. Thank you, Your Honors. Good morning, Your Honors. If it may please the Court, my name is Jay Levine and I represent Roseacre Farms, the appellee here. This is a rule of reason case and it's not even a close call. And the verdict did not and couldn't change that fact. There was a six-week trial and the jury found that Roseacre did not violate Section 1 of the Sherman Act. And yet, the plaintiffs now claim and are trying to turn that very verdict into saying just the opposite, that Roseacre violated the Sherman Act. Okay. Well, why don't you just go straight to Ms. Sullivan's main argument, which is, once they found that you were in a conspiracy to restrain supply, that is all we need to know. That's enough to say on the basis of century-old law, as she put it, we're in the land that has to be, per se, a rule and loose. What's wrong with her argument? A few different things. First, we have to keep in mind it is the Court and the Court's province alone to determine the mode of analysis. And the jury verdict cannot change that. And the Court here appropriately and properly applied the rule of reason. The default analysis in all Section 1 cases is the rule of reason, per se, is applied as an exception in a very limited number of cases. Hold on, Mr. Levine. If it's true that the Court is responsible for setting the parameters and that this was a rule of reason case, it was tried that way, it was presented to the jury on instructions that way, and the jury comes back and says there was a conspiracy to restrain supply, then is it, do we face an inconsistent verdict? Should there be a granting of a Rule 59 motion because the jury granted an inconsistent verdict? Because it's impossible to have said yes to questions 1 and 2 and no to question 3? We do not believe there's anything inconsistent about it because merely using the words conspiracy to reduce supply, whether in a complaint or even in a verdict form, does not talismanically invoke application of the per se rule. There are legions of cases where there are conspiracies to fix prices, conspiracies to reduce supply, and yet they have been held to be rule of reason because the conduct that we're talking about did not fit the mold of per se conduct, which is facially, manifestly, anti-competitive with no redeeming virtues. That's not the case here. So simply the jury's finding, which was a conspiracy to reduce supply comprised of A, B, and C, the three different mechanisms they alleged were unlawful, all of those mechanisms were in fact rule of reason. And the jury was charged under the rule of reason. So they found what they found in questions 1 and 2 in a universe defined by the rule of reason, and their finding cannot somehow retroactively redetermine the mode of analysis. And just as in enraged sulfuric acid, which is in the Seventh Circuit, there was literally an agreement to reduce supply. It was a shutdown agreement. And Judge Posner said, well, because there are some pro-competitive benefits and because it is not clear and it's not sort of automatic that these agreements would reduce supply, we are not going to apply the per se rule. The per se rule is only where that is the only, that anti-competitive effects are the only reasonable consequence from the action. Over here, that's clearly not the case. It is, there's nothing about this conduct that mandated a reduction in supply. Nothing forced a reduction in supply. And as- Well, when you say there's nothing about this conduct that mandated a reduction in supply, now you're making a factual argument and the jury found, no, there was an intent. You guys wanted to reduce supply. You set out to reduce supply. You actually succeeded in reducing supply below what it would have been if you hadn't gotten together and conspired. You meant to do it and you didn't. That seems to be the upshot from question one and question two being answered, yes. So in that world where those things have been said by the jury after a six-week trial, how can you make the argument that, okay, it's consistent with the rule of reason to say, yeah, this is all right. This is not an inconsistent verdict. Then to get to question three, even assuming you could legally get to question three, you could get to question three and properly get the answer, no, it's okay. I think there's two distinct answers to that question, Your Honor. The first is the question, was there a conspiracy to reduce supply, at best means that yes, and Roseacre's participation in it is that, yes, it may have been one of Roseacre's objectives to reduce supply, but that does not mean that the conduct that they did actually did reduce supply. In fact, that can't be the case because, A, we know supply grew, and two, we know that in answering question three and saying it's not unreasonable, the jury- Hold on a second, Mr. Levine. I'm not sure why you're fighting on this ground. I thought the record evidence supported the deduction, as Ms. Sullivan pointed out, that while egg supply went up, it did not go up in the way it would have, but for the conspiracy. There would have been more eggs on the market if you folks hadn't gotten together and clamped down. You can call that an increase, but you can also very well call that a suppression of supply because levels didn't reach what they should have. I'm not sure why you're fighting on that ground. Can you explain to me why that's important to you? Well, the finding in number one is that there was a conspiracy to reduce supply. That was at least one of the objectives, but remember the evidence at trial, yes, the plaintiffs submitted econometric evidence that the egg supply would have been greater. Defendants submitted evidence that that's not the case, but in answering number three, the jury found that it wasn't unreasonable, which means that either there was no anti-competitive effect, which means that they discounted and that any proof that the egg supply would have been greater than otherwise was just simply not true, or that even if there was some anti-competitive effect, the pro-competitive benefits of all of this conduct outweighed it. It's not a foregone conclusion, and one has to remember when you look at the conduct, there's nothing that says you need to reduce supply. I'll take the certified program as an example. What it does at most is say you have to give each hen a little bit more space, and if you have a confined space, there could be fewer hens. Well, yeah, that's all understood, but again, it sounds to me like you're going back to arguing a factual point that the jury just disagreed with you on. The jury said there was a conspiracy to suppress supply. The jury said your client was involved in it, so where's your benefit in trying to say, well, maybe there were other things it could have meant. The jury looked at it and said, no, it was a conspiracy to suppress supply, and you guys were in it. I'm not sure why you're fighting on that ground. It's puzzling to me. Well, just because the per se is not determined by what our intent is, and even if we had an intent to reduce supply, that doesn't determine whether the per se or rule of reason is applied, and therefore, even granting question one in the way Your Honor articulated it, that still doesn't determine whether, in fact, per se should be applied or not. Per se needs to be applied only where two conditions exist. There is an obvious, manifest, pernicious, anti-competitive effect, and there are no pro-competitive redeeming virtues. Could you give me your best authority for that proposition that where horizontal agreements to reduce supply are not subject to the per se rule? Well, the best, I would say, if you look at BMI and NCAA, NCAA was, in fact, a reduction in output, an agreement in reduction in output, but the Supreme Court basically said it's going to be rule of reason. Well, they said that, Mr. Levine, because in NCAA, without the restraint, the Court determined there would have been no market at all. That's not the circumstance here, surely. No, but I believe what the Court has said in BMI, in NCAA, in Legion, and in a host of cases, is that it's not the label that gets applied. BMI was very clear. Just applying a label is overly simplistic. This Court in Brown University said the test for per se is one of substance, not semantics. So it's not calling it a conspiracy to reduce supply or not that will determine. It is, okay, let's look at the actual restraints and do these actual restraints, and again, this is a question for the Court, do these actual restraints have such clear and manifest anti-competitive effects with no redeeming virtues? Only then can you then apply the per se rule, no matter what you call it, whether you call it a boycott. Does that mean there's really no such thing as the per se rule left? Because what you've just said is, if it fails under the rule of reason, then it's per se problematic. But that seems like almost, that sounds like linguistic gamemanship, because if what you really are doing is always applying the rule of reason, there's nothing left for the per se rule to exist, is there? No, I don't believe that's correct, Your Honor, because again, a judge is going to look at it, and whether it's at summary judgment, whether it's before the charging conference, and the judge will look at the character and nature of the conduct, and we can see if there are any plausible pro-competitive justifications. In many cases, the pro-competitive justification is, well, if I compete, I'll go out of business. And the Supreme Court says, that's not a plausible pro-competitive justification. But where there are plausible pro-competitive justifications, the courts take that into account in determining the rule of reason and the per se rule. And in fact, what you're under- Help me out, this is a logical matter. If you're always asking if there are pro-competitive benefits that offset the restraint of trade, that is, by definition, applying a rule of reason. So if that's the operation that you go through, there's no such thing as a per se rule left, is there? I don't think so, because you can determine just essentially in asking counsel, what are the plausible pro-competitive justifications, the plausibility of their argument is 99 times out of 100 easy to see. And in fact, Professor Arita, in I believe section 1510 at page 499, addresses just this situation. And it says that often, yes, if you're asking are there plausible pro-competitive justifications, it seems as if you're doing just the very thing the per se asks you not to do. But once you understand what the per se rule is all about, it makes perfect sense. And because the per se rule is a judgment by the judiciary that they have sufficient experience with the restraint at issue here, that they can say they know the end of the story already. They know that it's only going to have an anti-competitive effect and there's going to be no redeeming virtues. So I don't believe that our argument means the death of the per se. I will note that Legion and the courts have noted that the Supreme Court has been pulling back from the per se rule over the last few decades, because it is just applying the label allows you then to sort of scoop up within it pro-competitive conduct and condemn it summarily when that should not be the case. And the fact that the... Does the existence of the Capper-Bolstead Act here, even leaving aside the good faith affirmative defense argument that's been made, leaving that aside, does the fact that you've spoken to it specifically, does that cut one way or another in judging whether or not this particular combination, which is very found existed, should be subject to a per se or a rule of reason analysis? Well, putting aside the good faith argument and putting aside whether Capper-Bolstead actually applied here or not, but I do think it does augur for caution in applying the per se. Again, if it's something clearly per se, it's per se. But I do think it dovetails well, Your Honor's question, with what I was saying in that per se is only applied after the judiciary has experience with the conduct at issue. And let's face it, there are not many cases that deal with the types of conduct we're dealing with here. And in fact, to the extent there are, when there are standard setting cases and the like, all of those cases are judged under the rule of reason, recognizing there may be some anti-competitive potential, but there are also numerous pro-competitive benefits. And as Your Honor had alluded to earlier, the certified program was a legitimate response to customer demand. The customers, Walmart among them, Albertsons, Kroger, Safeway, were being picketed by the animal rights groups and the like, and came to the industry, and came to every industry in fact, and said, you guys need to develop a standard by which we can prove to people we are selling food made in a more humane environment. And that's exactly what we did. And responding to customer demand is probably number one on the list of pro-competitive benefits. All right, we're about the 15-minute mark, Mr. Levine. So let me first ask if Judge Restrepo and Judge Fuentes have any additional questions they want to ask. I do not. Judge Fuentes? Yeah, just one brief question. I mean, maybe it's just to make a point. Conspiracies are generally reviewed under the first A rule, isn't that correct? And isn't that what happened here? No, I don't think that's correct, Your Honor. Conspiracy in antitrust law... I don't know if I said the conspiracy to reduce supply. Again, conspiracies to reduce supply is a category. And if the conduct within that category is such that it produces sort of the obvious and manifest anti-competitive effect, or as the Supreme Court says, it almost always tends to restrict output and have no redeeming virtues, then yes. And so that is the type of conduct that's a category where it can be per se. But simply calling it a conspiracy to reduce supply is a form over substance. You don't look at the label applied. You look at the conduct that was the restraint itself. And the restraint itself here, the three mechanisms, are clearly a rule of reason. And in fact, the plaintiffs here never ever argued substantively why two out of the three were... They just gave it up. They never took Judge Prater up on her offer to brief it. And they voluntarily and somewhat gratuitously offered to have the entire case judged under the rule of reason. And with respect to the certified program, it's clear that that conduct, there's nothing in it that mandates a reduction in supply. If it did reduce supply, that doesn't end the inquiry, because obviously there are a lot of pro-competitive benefits, and that's exactly what the jury found in answering no to question three. Okay. Thank you, Mr. Levine. Thank you. Ms. Sullivan, your rebuttal. Thank you, Your Honor. I'd like to begin by agreeing that horizontal supply reduction conspiracies always trigger the per se rule of anti-competitiveness. And counsel on the other side was unable to cite you a single case that found otherwise, except for NCAA, which is clearly inapplicable here because the egg market would exist even without this joint conspiracy. As we know from the fact that the jury let two of the producers off the hook here. You don't need a conspiracy to serve consumer demand here. You can do so unilaterally. So there is no case except NCAA, and it's distinguishable. Second, Mr. Levine said this shouldn't just be about labels, but this is not about labels. The jury found an overarching conspiracy to reduce supply, and it found it with respect to short-term supply restrictions like killing and not replacing hens and exporting a coordinated export program to sell eggs abroad at a loss in order to increase domestic prices. And no one's advanced any pro-competitive aspects of those programs, which were clearly to reduce supply and increase prices. So the jury finding puts to rest any view that there was some different outcome here. And let... Hold on a second. Ms. Sullivan, would you please speak to the argument that Mr. Levine has made, which is what the district court actually held, and that is it's up to the court to put the analytical frame on this. And the court has put the rule of reason frame on this, and therefore it's not an inconsistent verdict for the jury to say, yeah, you did something that had potentially anti-competitive effects, but it also had pro-competitive effects. And therefore, within the realm of the rule of reason, you're okay. That those three questions can comfortably coexist with each other within the context of the rule of reason. I take that to be an argument I haven't put it as artfully as he did or as the district court did. But what is it that is fundamentally inconsistent about those verdict answers if the rule of reason is the frame the jury brought to it? So, Your Honor, we agree that the court sets the legal standard for the analysis, but the court legally erred here in imposing the rule of reason on a conspiracy to reduce supply. So the verdict is inconsistent. It is a contradiction in terms. You can't have a horizontal conspiracy to reduce supply that is subject to the rule of reason under 100 years of law. So the verdict form was improperly asked the jury to balance the pro-competitive effects of what it found to be a horizontal conspiracy to reduce supply. The law does not allow that. The court erred legally. And we respectfully think the only question is do you reverse under Rule 59E, which is the simpler approach, or for instructional error, or for error in the initial summary judgment. But, Your Honor, after the jury verdict, it's not about labels. It's about a finding of a horizontal supply restriction. And that should have been the end of the matter as to balancing any pro-competitive effects. Your Honor, Kapervolstead does not create any exception to the per se rule unless its statutory requirements are met. There's no dispute. They weren't met here. It's conceded in one of the gray briefs. I didn't ask about the good faith exception. I asked whether the existence of that had any bearing on whether this should be or could be looked at as a rule of reason circumstance that Congress has thought about and talked about agricultural cooperatives and thought that these were good things, whether that doesn't actually weigh one way or another in considering whether concerted behavior among agricultural producers is something which should be viewed as per se unlawful. Yes, Your Honor. And to answer your question, we think not. We do not think the existence of the Kapervolstead statutory exception for agricultural cooperatives alters application of the per se rule to an agricultural producer's conspiracy to restrict supply unless and until the letter of the statutory exception is met and it's conceded it wasn't met here and for reasons that I won't belabor, we don't think this court should be the first to create a new judicially created exception that Congress didn't provide. So, Your Honor, we think it does not alter. Default antitrust law applies and the per se rule applies here unless and until Kapervolstead is met and it's not. Okay. Well, counsel, thank you very much for your argument today. Appreciate it and appreciate the briefing that we've received. We've got the matter under advisement.